610-07/GMV/SL
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
SCHUYLER LINE NAVIGATION CO.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Gina M. Venezia (GV 1551)

RECEIVED
DEC 05 2007
U.S.D.C. S.D.N.Y.
CASHIERS

JUDGE CHIN

07 CV 11041

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

SCHUYLER LINE NAVIGATION CO.,

07 Civ _____ ( )

                              Plaintiff,

          -against-                                **VERIFIED COMPLAINT**

SEAFREIGHT PLC, U.K.,

                              Defendant.
-----------------------------------------------------------------------x

Plaintiff, SCHUYLER LINE NAVIGATION CO. (hereinafter "SLNC") for its Verified

Complaint against Defendant SEAFREIGHT PLC, U.K. (hereinafter "SEAFREIGHT") alleges

upon information and belief as follows:

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract

of charter party. This case also falls under this Court's admiralty and maritime jurisdiction

pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C.

§1331 in that the action arises under the New York Convention on the Recognition and

Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et seq.* and/or the Federal

Arbitration Act, 9 U.S.C. §1 *et seq.*

2.      At all times material hereto, Plaintiff SLNC was and still is a domestic business entity duly organized and existing under the laws of the State of Maryland of the United States with an address at 100 Severn Avenue, Suite 103, Annapolis, MD 21403.

3.      At all times relevant hereto, Defendant SEAFREIGHT was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at Provident House, Burrell, Row, Beckenham, Kent BR3 1AT, England.

4.      On or about October 26, 2006, Plaintiff SLNC, as disponent owner of the M/V NIKAT, entered into a maritime contract of charter party with Defendant SEAFREIGHT, as charterer, for the carriage of steel and/or wire rod cargo. (Attached hereto as **Ex. A** is a copy of the charter party).

5.      The MV NIKAT was fitted with cranes capable of lifting the steel and/or wire rod cargo.

6.      Defendant SEAFREIGHT was required to hire and pay for stevedores to operate the cranes during discharge of the cargo.

7.      All repair costs arising out of damage to the vessel's cranes caused by stevedores were for Defendant SEAFREIGHT's account, provided that SEAFREIGHT was notified of the damage within 24 hours after it occurred.

8.      Hire was also payable by Defendant SEAFREIGHT at a rate of $24,000 per day pro rata.

9.      Plaintiff SLNC duly tendered the vessel into the service of Defendant SEAFREIGHT and fully performed its obligations as required under the charter.

10.      During discharge at port Jebel Ali, SEAFREIGHT's stevedores negligently operated and damaged two of the vessels cranes while handling the cargo.

11.    Within 24 hours after each incident of damage, five damage reports were issued and received by SEAFREIGHT, providing SEAFREIGHT with notice of the five separate damage events caused by the stevedores to cranes No. 2 and No. 3.

12.    SLNC, shortly thereafter, issued an invoice to SEAFREIGHT for the repair costs arising out of the crane damage in the amount of $31,853. (Attached hereto as **Ex. B** is a copy of the invoice).

13.    At the conclusion of the charter period, Plaintiff SLNC submitted a final invoice statement to Defendant SEAFREIGHT showing a balance due in Plaintiff's favor in the amount of $24,464.15 (hire/bunkers) + $31,853 (crane repair costs) = $56,317.15. (Attached hereto as **Ex. C** is a copy of the invoice).

14.    In breach of the terms of the charter party, and despite due demand, Defendant SEAFREIGHT has refused and/or otherwise failed to pay the amounts due and outstanding under the charter party, and the entire amount of $56,317.15 remains due and owing.

15.    At all times relevant hereto, and upon information and belief, Forever Maritime Ltd. acted as a paying and/or funding agent for purposes of holding assets, receiving funds and/or transmitting funds in satisfaction of debts or obligations of Defendant SEAFREIGHT. Defendant SEAFREIGHT has arranged and/or has otherwise directed that payments or other funds which were due to Plaintiff SLNC and owed by SEAFREIGHT be paid by Forever Maritime Ltd. In fact, Forever Maritime Ltd. made all six hire payments under the charter on behalf of SEAFREIGHT on the following dates:  November 7, 2006, November 21, 2006, December 6, 2006, December 11, 2006, December 13, 2006 and December 21, 2006. (Attached hereto as **Ex. D** is a copy of the banking details of the six hire payments).

16.    The charter party provides for the application of English law and disputes between the parties to be resolved by arbitration in London, and Plaintiff SLNC specifically reserves its right to arbitrate the substantive matters at issue. Arbitration has been commenced.

17.    This action is brought *inter alia* pursuant to 9 U.S.C. §8 in order to obtain security for SLNC's claims made or to be made in arbitration in London, England under English law, as agreed by the parties.

18.    As provided for by English law and arbitration, attorneys fees are awarded to the successful litigant, along with costs, disbursements, the cost of the arbitration, and interest, all of which constitutes a part of the Plaintiff's main claim and the amount sued for herein.

29.    Plaintiff SLNC estimates, as nearly as can presently be computed, that the legal expenses and costs of prosecuting its claims in London arbitration will be $40,000. Interest anticipated to be awarded is estimated to be $7,123.70 (calculated at the rate of 6% per annum compounded quarterly for a period of 2 years, the estimated time for completion of the proceedings in London).

30.    In all, the claim for which Plaintiff SLNC sues in this action, as near as presently may be estimated, totals **$103,440.85**, no part of which has been paid by Defendant SEAFREIGHT. Plaintiff SLNC specifically reserves its right to amend this figure and to seek an increase in the amount of security should such sum appear to be insufficient to fully secure Plaintiff SLNC.

### Request for Rule B Relief

31.    Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff believes that Defendant has, or will shortly have,

assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant SEAFREIGHT PLC, U.K. (collectively hereinafter, "ASSETS"), including but not limited to ASSETS in its name and/or being transferred for its benefit or as may be held, received or transferred for its benefit in the name of its paying and/or funding agent Forever Maritime Ltd. at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

32.    The total amount sought to be attached pursuant to the above is **$103,440.85**.

WHEREFORE, Plaintiff SCHUYLER LINE NAVIGATION CO. prays:

a.    That process in due form of law according to the practice of this Court may issue against Defendant citing it to appear and answer the foregoing;

b.    That if Defendant cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant up to and including **$103,440.85** be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due, held or being transferred to or for the benefit of Defendant SEAFREIGHT PLC, U.K., including but not limited to ASSETS in its name and/or being transferred for its benefit in the name of its paying and/or funding agent Forever Maritime Ltd. at, moving through, or within the possession, custody or control of such banking institutions and/or any such other

garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c.     That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to the recognition and enforcement of any award entered against the Defendant in the London proceedings; and

d.     For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
           December 5, 2007

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
SCHUYLER LINE NAVIGATION CO.

By: _____
       Gina M. Venezia (GV 1551)
       80 Pine Street
       New York, NY  10005
       (212) 425-1900 (telephone)
       (212) 425-1901 (fax)

## ATTORNEY VERIFICATION

State of New York   )
                      ) ss.:
County of New York  )

GINA M. VENEZIA, being duly sworn, deposes and says as follows:

1.     I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.     The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3.     The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is an entity, none of whose officers are presently within this Judicial District.

_____
Gina M. Venezia

Sworn to before me this
5th day of December 2007

_____
Notary Public
MELISSA COLFORD
Commissioner of Deeds
City of New York-No. 5-1692
Certificate Filed in New York
Commission Expires 4/1/ 08

Ex. A

# TIME  CHARTER
### GOVERNMENT FORM
*Approved by the New York Produce Exchange*
November 6th, 1913 – Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1   **THIS CHARTER PARTY**, made and concluded in……**London**… … … … … … … … … … 26th….. day of …… October… … … … … … … … … ~~192006~~… … ..

2   Between …**SCHUYLER LINE NAVIGATION COMPANY, USA, as timechartered** … … … … … … … … … … … … … … … … … … … … … … … … … … … …

3   Owners of the good…**Maltese Flag** ……….. ~~{Steamship/Motorship}~~…… **"NIKAT "**…**of**…(See Clause 53 for vessel's description)

4   of … … … … …….. tons gross register, and … … … … … ….tons net register, having engines of … … … … … … … … … .. indicated horse power

5   and with hull, machinery and equipment in a thoroughly efficient state, and classed … … … … … … … … … … … … … … … … … …

6   at … … … ……… …of about …cubic feet bale capacity, and about … … … … … … … … … … … … … … … … … … … … … … tons ~~of 2240 lbs~~

7   deadweight capacity (cargo and bunkers, including fresh water and stores ~~not exceeding one and one-half percent of ship's deadweight capacity,~~

8   ~~allowing a minimum of fifty tons~~) on a draft of … feet … … inches on … … …… Summer freeboard, inclusive of permanent bunkers,

9   which are of the capacity of about… … … … … … … … … … … … … … … … … … … … … … … tons of fuel, and capable of steaming, fully laden, under good weather

10   conditions ………….about … ..….knots on a consumption of about ……… tons of best welsh coal-best grade fuel oil-best grade diesel oil,

11   now.....**trading**… … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … …

12   … … … … … … … … and …**SEAFREIGHT PLC, U.K.** … … … … … … … … … … … … … … … … … … … … … … ..… Charterers of the City of…… **London**… … … … … … ..

13       **WITNESSETH,** That the said owners agree to let, and the said  Charterers agree to hire the said vessel, from the time of delivery, for

14   about…one timecharter trip always via safe port(s)/safe berth(s)/safe anchorage(s), always afloat, always within IWL, in/out of geographical

15   rotation, via Turkey to AG/PG with lawful/harmless cargo of steels and/or wire rods in coil. Duration about 30 days but maximum
    12th December, 2006 … … … … … … … … … … … … … … … … … … … … … … … … … … …within below mentioned trading limits.

16   Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17   the fulfillment of this Charter Party. Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations hereunder.

18   Vessel to be placed at the disposal of the Charterers, ~~at~~ when where Charterers shall not constitute any waiver of Owners' obligations hereunder.

19   Sundays, holidays included, as long as authorities allow same, otherwise droppling last outward see pilot Nemrut Bay, Turkey … … …… … …….

20   ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No.6), as~~

21   ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No.5.~~ Vessel on her delivery  to be

22   ready to receive **any permissible** cargo with clean  swept, **and dried holds and tight, staunch, strong and in every way fitted for the service,**
  having water ballast, ~~winches and~~

23   donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the  winches at one and the same

24   time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed  in carrying lawful merchan-

25   dise, ~~including petroleum or its products, in proper containers,~~ excluding … ..see Clause 38.… … … … … … … … … … … … … … … … … … …

26   ~~(vessel is not to be employed in the carriage of Live Stock, but  Charterers are to have the privilege of shipping a small number on deck at  their risk~~

27   ~~all necessary fittings and other requirements to be for account of  Charterers), in such lawful trades, between safe port and/or safe ports in British North~~

28   ~~America and/or United States of America, and /or West Indies, and /or Central  America, and /or Caribbean  Sea, and /or Gulf of Mexico, and /or~~

29   ~~Mexico and /or South America~~… … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … and / or Europe

30   ~~and /or Africa, and / or Asia, and / or Australia, and / or Tasmania, and / or New Zealand, but excluding Magdalena River, River St. Lawrence between~~

31   ~~October  31st and  May  15th, Hudson Bay and all safe  ports, also excluding, when out of season, White  Sea, Black  Sea and the Baltic,~~

32   … **See Clause 37 for Trading Exclusions**… … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … …

33   … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … ..

34   … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … … …

35   as the Charterers or their Agents shall direct, on the following conditions:

36       1. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees **including agency fees pertaining to**
    **Owners' matters of the Crew;** also pay for the

37   insurance of the vessel, also pay for all the cabin, deck, engine-room and other  necessary stores, including, **sea protest, drinking water, lubricating oil**
    **and garbage dues, even if compulsory,** boiler  water and maintain  her class and keep

38   the vessel in a thoroughly efficient state in hull, **cargo spaces,** machinery  and  equipment for and during the service.

39       2. That whilst on hire the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, **compulsory or customary and**
    **Bosphorus Pilotages,** Agencies, Commissions,

40   Consular Charges  (except those pertaining to the Crew **and flag),** and all other usual expenses except those before stated, but when the vessel puts into

41   a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42  illness of the crew or **cargoes carried prior to delivery** to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43  charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period~~

44  ~~of six months or more~~ .

45      Charterers are to provide necessary dunnage and shifting boards, **and** also any extra fittings requisite for a special trade or unusual cargo, but

46  Owners to allow them **the** use of any dunnage and shifting boards **and lashing equipment** already aboard vessel. Charterers to have the privilege of using shifting boards

47  for dunnage, they making good any damage thereto.

48      3. ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~

49  ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ...........................................tons and not more than~~

50  ~~..........................tons and to be re-delivered with not less than ............................... tons and not more than .......................tons. See Clause 62.~~

51      4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of... **US$ 24,000 per day/pro rata including overtime**.......................

52  **payable every 15 days in advance. First hire payment to include value of bunkers estimated to perform the voyage which to be paid latest within 2 banking days after vessel's delivery. Hire calculation time based on GMT for delivery/redelivery.** United States Currency ~~per ton on~~

53  ~~vessel's total deadweight carrying capacity, including bunkers and~~ Stores, on ...................................................~~summer freeboard, per Calendar Month~~, commencing on and from the **time** ~~day~~ of her delivery, as aforesaid, and at

54  and after the same rate for any part of a **day** ~~month~~; hire to continue until the **time** ~~hour~~ of the day of her re-delivery in like good order and condition, ordinary

55  wear and tear excepted, to the Owners (unless lost) ~~at~~... **on dropping last outward sea pilot, Jebel Ali, UAE, any time day or night, Sundays and Holidays**

56  **included**... ... ......unless mutually agreed. Charterers to give Owners not less than **15/10/7/5/3/2/1** days approximate

57  notice of vessels expected date of re-delivery, and probable port.

58      5. Payment of said hire to be made in **See Description** ~~New York~~ in cash in United States Currency, **15 days** ~~semi-monthly~~ in advance, and for the last 15 days ~~half-month~~ or

59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60  due, if so required by the Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~

63  ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

64  ~~to have the privilege of using vessel at once, such time used to count to hire.~~

65      Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain , by the Charterers or their Agents, subject

66  to 2 ½% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67  of such advances.

68      6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place **in port or elsewhere** that Charterers or their Agents may

69  direct, provided the vessel can safely lie always afloat **See lines 14/15** ~~at any time of tide, except at such places where it is customary for similar size vessels to~~

70  ~~safely~~ ~~lie aground.~~

71      7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also

72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73  tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charterers

74  paying owners ... ... ... ..... per day per passenger for accommodation and meals. However it is agreed that in any case any fines or extra expenses are

75  incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.

76      8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78  agency; and Charterers are to load, stow, and trim **tally, lash, secure** and discharge the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for

79  cargo as presented in, conformity with Mate's ~~or Tally Clerk's receipts.~~

80      9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81  receiving particulars of the complaint, investigate the same, and, if necessary , make a change in the appointments.

82      10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84  rate of **$1.00** per day. Owners to victual Pilots and Customs Officers, and ~~also, when authorised by Charterers or their Agents,~~ to victual Tally

85  Clerks, Stevedore's Foreman, etc., Charterers paying **USD 1,250 per calendar month/pro rata for cabling/telex/victualling and entertainment** ~~at the current rate per meal, for all such victualling.~~

86  11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing and the
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of daily deck and engine Logs,in English showing the course of the vessel and distance ru
    and the con-
89  sumption of fuel.
90  12. That the Captain shall use diligence in caring for the ventilation of the cargo.
91  13. That the Charterers shall have the option of continuing this charter for a further period of ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...
92  ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...
93  on giving written notice thereof to the Owners or their Agents... ... ... ... days previous to the expiration of the first-named term, or any declared option.
94  14. That if required by the Charterers, time not to commence before 02nd November, 2006, 00.01 hrs local time............and should vessel
95  not have given written notice of readiness on or before... ... 10th November, 2006, 24.00 hrs local time... ... ... ... ... ... but not later than 4 p.m. Charterers or
96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
97  15. That in the event of the loss of time from deficiency and/or default of men or deficiency of stores, fire, breakdown or damages to hull,
    machinery or equipment,
98  grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
    whatsoever unless such causes are due to Charterers and/or their agents and/or their servants
99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all extra expenses shall be deducted from the hire.
102 16. That should the vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) also cost
    of estimated bunkers on board at time of loss shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105 The vessel shall have the liberty to sail with or without pilots, to tow and be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.
107 17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to Arbitration as per Clause 48
    three persons at New York,
108 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
109 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men,
110 18. That the Owners shall have a lien on all cargoes, and all sub-freights hire and sub-hire for any amounts due under this Charter,
    including General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.
114 19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of
116 York-Antwerp Rules 1994 and any subsequent amendments, hire not to contribute to General Average 1924, at such port or place in
    the United States as may be selected by the carrier, and as to matters not provided for by these
117 Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into
118 United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at
119 the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
120 bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
121 or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
122 required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
123 carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the
124 place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in
125 United States money.
126 In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever
127 whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the
128 goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,
129 losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the
130 goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or

131 ships belonged to strangers. See New Jason Clause, as attached.
132    Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. **English Law to apply.**
133 20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed
to as to quantity, and the
134 cost of replacing same, to be allowed by Owners.
135 21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a
136 convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from
137 time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.
138 ... ... No drydock under this Charter Party, except in case of emergency ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...
139 ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...
140 22. Owners shall maintain the gear of the ship as fitted, providing gear (for all cranes derricks) capable of handing lifts up to **maximum in accordance with description clause** three tons, also
141 providing ropes, falls, slings and blocks as on board. If vessel is fitted with cranes derricks capable of handling heavier lifts, Owners are to provide necessary gear for
142 same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel sufficient light for lanterns and oil for
143 night work, **in holds, on deck and hatches** and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at
144 Charterers to have the use of any gear on board the vessel.
145 23. Vessel to work night and day, if required by Charterers, and all cranes winches to be at Charterers' disposal during loading and discharging;
146 steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,
147 deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. **Charterers to** supply cranemen, if the rules of the
148 port, or labor unions, prevent crew from driving cranes winches, shore **Cranemen** Winchmen to be paid by Charterers. In the event of a disabled **crane or cranes** winch or winches, or
149 insufficient power to operate cranes winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay for any loss of time occasioned
150 thereby. **And extra proven expenses including standby expenses.**
151 24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152 in the Act of Congress of the United States approved on the 13th day of February, 1898 and entitled "An Act relating to Navigation of Vessels;
153 etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both
154 of which are to be included in all bills of lading issued hereunder.
155                                        U.S.A. Clause Paramount
156    This bill of lading shall have effect subject to the provisions of Carriage of Goods by Sea Act of the United States, approved April
157    16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158    any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
159    be repugnant to said Act to any extent, such term shall be void to that extent, but no further.
160                                        Both-to-Blame Collision Clause
161    If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
162    Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
163    hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
164    or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
165    carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
166    owners as part of their claim against the carrying ship or carrier. See New Both-to-Blance Collision Clause, as attached.
167 25. The vessel shall not be required to enter any ice-bound port,  or any port where lights or light-ships have  or are  about  to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging
170 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers.  The Owners to remain responsible for the
171 navigation of the vessel, acts of pilots and tugboats insurance,  crew, and all other matters, same as when trading for their own account.
172 27. A commission of 1.252 ½ per cent is payable by the Vessel and Owners to Howard Bridge and Associates Limited and 1.25%
173 ... to Century Chartering (UK) Limited ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175 28. An address commission of 3.752 ½ per cent payable to ... ... Charterers ... ... ... ... ... ... ... ... ... ... ... ....on the hire earned and paid under this Charter.
**Additional Clauses 29 through 90, New Both-to-Blame Collision Clause, General Average and the New Jason Clause, Conwartime 1993**

Clause, Bimco Standard Law & Arbitration Clause 1998, U.S.A. Clause Paramount, Bimco ISPS Clause, all, as attached to be deemed part of and incorporated in this Charter Party.

Charterers                                                        Owners

This is a computer generated NYPE 46 form. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original approved document shall apply. We assume no responsibility for any loss or damage caused as a result of discrepancies between the original approved document and this form

**RIDER CLAUSES TO M/V "NIKAT" CHARTER PARTY DATED 26TH OCTOBER 2006**

**Clause 29 - Notices**
Notices: Owners or Master to give Notice on fixing / 7 / 5 / 4 / 3/ 2/1 days notice to :
Charterers (Sea Freight Plc)  fax +44 20 8650 5477
Email  seafreight@seafreightplc.com
Ourselves (Sea Pioneer Ltd)  fax +44 20 8650 6519
Email  seapioneer@seapioneer.com  -and-  sea.pioneer@btconnect.com
Agents (once nominated)

**Clause 30 - Time Charter Period / Options / Rate of Hire  - Deleted**

**Clause 31. Certificates / Vaccinations**
Vessel to be in possession of the necessary certificates to comply with safety and health regulations
and all current requirements at all ports of call during the currency of this Charter Party. Owners are
obliged to deliver and keep the vessel, her crew and anything pertaining hereto supplied with up-to-
date and complete certificates and approvals and equipment and fittings, enabling the vessel and her
crew to load, carry and discharge all cargoes permitted under this Charter Party, and to receive
bunkers within the trading limits of this Charter Party, even where such certificates, approvals,
equipment, fittings, become necessary before or after the commencement of this Charter Party.
It is the responsibility of the Master and the Owners to arrange for vaccination required at ports of
call and to keep on board corresponding valid certificates.
If Owners fail to comply herewith, any time lost and all extra expenses to be for Owners' account
and Charterers may deduct same from the hire.

**Clause 32 - International Tonnage Certificate**
Upon delivery the vessel shall have onboard an International Tonnage Certificate valid for the
duration of this Charter Party and such Tonnage Certificate shall be acceptable by the local
Authorities at the countries of call within the trading limits of this Charter Party. Should such
tonnage Certificate result in an increase in the vessel's port expenses, such increase to be for
Owners' account, Should such certificates not be acceptable to the local authorities, any time lost
and all extra expenses for issuing an acceptable certificate are to be for Owners' account.

**Clause 33 - I.T.F. / Flag Restrictions**
Owners' warrant that the officers and crew of the vessel are covered for the duration of this Charter
Party by an I.T.F. agreement or other bona fide trade union agreement conforming to I.T.F.
standards acceptable world wide, loss of any time any extra expenses incurred as a result of non-
compliance shall be Owners' account and may be deducted from hire.
The Owners are responsible for any loss of time, delay or restriction to the full working of the
Vessel resulting from any action that may be taken against the ship and/or the Owners by third
parties for any reason whatsoever, unless caused by Charterers and/or their agents and/or servants.
Any time lost as a consequence of any such action by third parties shall be considered as off-hire
and shall be deducted from the hire. Any extra expenses resulting directly or indirectly from such
action shall be the responsibility of any paid for by the Owners or, In Charterers' option, shall be
paid by the Charterers and deducted from the hire.

Owners guarantee that the vessel is not blacklisted/boycotted or arrested due to vessel's
flag/ownership/crew employment/age/past trading in countries under this Charter Party.

Should the country of the vessel's flag exclude the vessel from trading to the USA, Canada or Japan,
Charterers have the option of cancelling this Charter Party.

**RIDER CLAUSES TO M/V "NIKAT" CHARTER PARTY DATED 26TH OCTOBER 2006**

**Clause 34 - Oil Pollution**
A)      If the Owners are required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawful to enter, remain in or leave any port, place, territorial or contiguous waters or any country or state in performance of this Charter Party, the Owners shall make all arrangements by bond or otherwise may be necessitated to satisfy such requirements at the Owners' sole expense.

B)      The Charterers shall be under no responsibility for all consequences (including loss of time) of oil or other pollution damage and any failure or inability of the Owners to do so as provided for the above and any loss of time incurred thereby shall be off-hire, unless the same shall be due to the default of the Charterers.

C)      The Owners shall indemnify the Chatterers harmless against all consequences (including fines if any imposed to the Charterers) of oil or other pollution damage unless due to the Charterers and any failure or inability of the Owners to do so as provided for in the preceding paragraph A).

In connection with the preceding paragraph A), a particular reference is made to a Certificate of Financial Responsibility in compliance with requirements of the Oil Pollution Act of 1990 and the Comprehensive Environment Response, Compensation and Liability Act.

D)      In the event of significant improvement, structural changes, considerable expensive new equipment and/or additional insurance or certificates, which affects against the Owners' commercial transaction/vessel's management, becoming necessary for the continued operation of the vessel by reason of new requirements of any states or rules, regulations and/or ordinances introduced to the trade, the Charterers and the Owners shall discuss to mutually agree in compliance with such new requirements.

**Clause 35 - P&I Club / Cargo Claims**
Owners guarantee that the vessel is entered and shall remain entered in a Protection and Indemnity Association for the duration of this Charter Party.
Entry shall include but not be limited to full cover cargo for cargo claims of any nature.

Vessel is presently entered with : American Club
Charterers' P & I Club : to be advised

Any liability to third parties for cargo claims shall be apportioned between Owners and Time Charterers in accordance with the Inter-Club New York Produce Exchange Agreement 1996 or latest amendments thereto.

The Party having paid the claim(s) shall submit same to the other party with supporting documents as soon as possible but neither party shall between themselves refer to the 2 (two) years time limit as a defence.

Should any cargo be damaged for which the Owners remain wholly responsible, any time lost and extra expenses incurred in that respect shall be deducted from the hire.

**Clause 36 - Liability Insurance**
The Charterers shall not be responsible for loss of life nor personal injury nor arrest or seizure or loss or damage to the vessel and/or other objects arising from perils insured against by customary policies of insurance.

**RIDER CLAUSES TO M/V "NIKAT" CHARTER PARTY DATED 26TH OCTOBER 2006**

**Clause 37 - Trading Exclusions**
Cuba, Abkhazia, Albania, former Yugoslavia but Slovenia/Croatia allowed. Israel. Turkish Occupied Cyprus, Norway, Sweden, Finland, Australia, New Zealand and their territories, CIS Pacific countries during Gypsy Moth time, Eritrea, Iraq, Cambodia, North Korea, Cabinda, North and South Yemen, Sri Lanka however Colombia allowed, Zaire, Ethiopia, Great Lakes, Alaska, Iceland, Now war zones, no trading in ice ports/zones/areas/vessel not to force ice. Vessel not to trade directly between Taiwan and China.

**Clause 38 - Cargo Exclusions**
All harmful, hazardous, inflammable or injurious cargoes including tnt, bombs, livestock, tobacco, fishmeal, bones, mobile and prefabricated homes/buildings, asbestos, radio isotopes, bitumen, pitch, tar, asphalt in bulk, vegetables and fruit, creosoted goods, sponge iron, iron briquettes, hides, arms, ammunition, explosives, d.r.i., sunflower seed expellers, cottonseed expellers, raw cotton, new copra, copra expellers, charcoal, euebrqacho extract, querbacho shavings, zinc ashes, salt cakes, nuclear and radioactive products and waste, acids in drums, dynamite, calcium carbide, Indian coal or hot coal with temperatures above transportable limits, petroleum or its products, black powder, blasting caps, resin, calcium hydrochloride otherwise known as calcium oxychloride, seedcakes, oilcakes, naphtha, caustic soda, motor blocks turnings, bulk ammonium, paddy rice, chrome ore, bulk coffee, bulk cocoa, containers except if containers are part of general/project cargo, linseed oils, milled rice, manioc and manioc pellets, mineral sands, Niger seeds, turpentine resin, spirits, palm kernels, palm seeds, pond coal, radio isotopes, hurry, sodium sulphate in bulk, river and/or sea sends, sponged iron, Chilean nitrates but Chilean nitrates are permitted provided not co2 required, quicklime and boraz. Concentrates to be allowed always in accordance with IMO regulations. Any special fittings required to be for Charterers' account.

Scrap protective clause:
1) Charterers have liberty to carry heavy melting scrap 1 & 2 or shredded scrap, (whether it be full or part cargo), during the entire currency of this charter party, on following conditions.

a) The scrap mentioned herein only limited to heavy melting scrap 1 & 2 or shredded scrap non-oily specifically excluding motor blocks and turnings and also metal borings and cuttings.
b) Charterers undertake that loading of first layer of scrap no to be released until touching tanktop and not to be dumped/dropped during loading, first layer of scrap to be loaded at height and to be evenly stowed/trimmed to the reasonable satisfaction of master before loading balance of cargo.

Petcoke protective clause
Charterers are permitted to carry petcoke (whether it is full or part cargo), during this period on following conditions:
a) Petroleum coke mentioned herein is only limited to the type of non-hazardous/non-dangerous green delayed type and/or calcined type.
b) If Charterers exercised such option, Charterers undertake to use holds as less as possible, provided vessels stability trim and stress permit.
c) Such cargo to be loaded/stowed/trimmed/discharged strictly according to latest IMO and/or any other latest regulations/rules applicable to such cargo.
d) Should any additional/special wash down of holds before loading be reasonably recommended/proposed/required by master, Charterers undertake to arrange the same at their time/expense.
After discharge Charterers to arrange at their expense/time of any additional/special wash down of holds carrying such cargo by chemical as master reasonably considers it necessary.

**RIDER CLAUSES TO M/V "NIKAT" CHARTER PARTY DATED 26TH OCTOBER 2006**

   e)  Such cargo not to be the last cargo prior to redelivery.

Bulk cement protective clause

a)  Charterers undertake to use holds as less as possible, provided vessel's stability trim and stress permitting.

b)  Should any additional/special wash down of holds before loading be required/recommended by independent surveyors appointed by Charterers at their expense, such wash down to be arranged by Charterers at their expense.

c)  Charterers are allowed to drill holes and/or make any opening on any hatch covers for purposes of loading/stowing/trimming/discharging.

d)  Such cargo not to be the first cargo after delivery nor the last cargo prior to redelivery.

e)  Cement holes/cement clause

In the event of loading cement in bulk, the following clause to apply. It is understood and agreed that Charterers have the option to cut holes on hatch covers for loading bulk cement on the following conditions:

a)  All cutting and restoring of the holes to be fully supervised/attended/approved by classification surveyor with written documents.

b)  Holes to be cut at the suitable place of hatch cover in accordance with vessel's builder's specification.

c)  When restoring cement holds, chill plates or similar material if deemed necessary by master/surveyor to be fitted for complete welding in order to reinstate the hatchcovers back to their original condition.

d)  After completion of restoring of holes, hose test to be carried out in presence of classification surveyor and the test result should be to his satisfaction. Otherwise the Charterers have the obligation to rectify the situation until and when satisfied by surveyors.

e)  All time for preparing, cutting and restoring up to classification surveyor's satisfaction as well as all expenses including classification surveyor's fees and expenses shall be for Charterers' account.

Lime washing clause

In case of sulphur loading Charterers to arrange vessel's holds to be lime washed in strict accordance with IMO and/or local regulations/and to master's reasonable satisfaction. The holds should be thoroughly washed down with freshwater before lime washing at Charterers' time and expense. The cargo is to be loaded, carried and discharged in accordance with IMO or equivalent safety regulations. The vessel's holds, intended for carriage of sulphur, will be lime washed on the tank tops, sides shells and bulkheads. Such operation is to be carried out in Charterers' time and expense. If Charterers wish vessel's crew to carry out such lime washing then Charterers to pay Owners USD 600 per hold in lie thereof, excluding materials.

All necessary equipment and materials are to be supplied by Owners at Charterers expense but in case vessel has insufficient materials/supplies on board same to be supplied by Charterers at their expense. If sufficient materials and/or equipment and/or sufficient time is not available or inclement weather conditions prevail which prevent sub lime washing to be completed prior to vessel's arrival at loading port, then crew are to complete lime washing as soon as possible after vessel's arrival at load port, and always provided shore/local regulations/authorities permit. If shore regulations do not permit crew to complete the task, then shore labour to be employed at Charterers time/risk and expense. The vessel will remain on-hire at all times during such operation(s) and crew to be considered as Charterers' servants and Owners not to be responsible in case vessel's holds will not pass the required inspection. Irrespective of whether the crew has been used to lime wash holds or not, immediately after discharge of sulphur cargo. Holds to be swept clean of residues and holds to be thoroughly washed with fresh water by Charterers at their time and expense so that all time is removed from vessel's holds to master's/owners' reasonable satisfaction. If Charterers wish crew to

**RIDER CLAUSES TO M/V "NIKAT" CHARTER PARTY DATED 26TH OCTOBER 2006**

carry out above cleaning/washing down of holds then Charterers to pay Owners USD 600 per hold excluding materials, but if , despite the crew's efforts, the lime and/or sulphur cannot be removed then Charterers are entitled to arrange removal/cleaning of sulphur/lime at their time and expense so that holds are again in same condition as prior to loading of sulphur except wear and tear. Irrespective of whether the crew has been used in cleaning/washing down of holds as above, if an corrosion has been caused to vessel's holds by the presence of sulphur or from the removal of lime, the Charterers, in their time and expense, are to remove rectify same by chipping or shot blasting or any other method acceptable to the master so that the condition of the holds is in the same condition as before loading the sulphur except wear and tear.

**Clause 39**
Vessel must be in possession of a valid loose gear certificate for calling Indian ports and if vessel is over 15 years of age, vessel also to be in possession of a valid Saudi Arabian gear certificate. Valid certificates must be on board for inspection at all ports of call. If certificates are not on board Owners will arrange prior arrival Saudi.

**Clause 40 - Weather Routing**
The Charterers may supply an independent weather routing company's advice to the Master during voyages specified by the Charterers, the Master shall comply with the reporting procedure of the routing service selected by the Charterers. Evidence of weather conditions shall be taken from the vessel's deck log and weather routing company's reports. In the event of a consistent discrepancy between the deck logs and weather routing Company's reports, the latter shall be taken as ruling.

**Clause 41 - Master's / Crew's assistance**
The following services in respect of loading and discharging operations from officers and crew are included in the hire provided port regulations permit:
- raising/lowering and rigging of derricks/cranes
- raising gangway in preparation for gaining access to vessel
- opening and closing of hatches in connection with loading and discharging
- closing and opening of hatches in the event of weather which may adversely effect condition of cargo carried on board during loading and discharging
- maintaining sufficient steam/electric power and derricks/cranes whilst loading and discharging including regular maintenance of derricks/cranes.
- shifting vessel during loading and discharging and shifting berth
- bunkering
- officers and crew to shape up vessels hatches and derricks/cranes as much as possible prior to arrival loading and/or discharging places so as to immediately commence loading and/or discharging operations subject to weather conditions and safety of navigation, ship and crew.

**Clause 42 - Bill Of Lading**
With reference to Clause 8, it is understood that the Charterers and/or their agents may sign Bill(s) of Lading on Master's behalf provided same are in conformity with Mate's and/or Tally Clerk's receipts. If required for the Charterers export Black Sea trade, Master to sign mate's receipts with the discharge port as presented despite the fact that these mate's receipts might show a different port of discharge than the vessel's intended voyage, however the Bills of Lading to show the actual discharge port and Charterers to sign a Letter of Indemnity for change of destination according to Owners' P and I Club wording.

Furthermore, Owners/master to accept a change of shippers/notify/consignee address between mate's receipts and Bills of Lading, if required for this trade. Charterers undertake responsibility for any or all consequences resulting from such change and will issue an L.O.I. holding master/owners harmless and free from liability accordingly.

**RIDER CLAUSES TO M/V "NIKAT" CHARTER PARTY DATED 26TH OCTOBER 2006**

**Clause 43 -Supercargoes / Port Captain**
The Charterers or their supercargo(es) are entitled to call for speed trails, in ballast or loaded condition, indemnifying the Owners for any extra expenses in this connection. The Charterers and/or their supercargo(es) may install and remove at their expense, time and risk such instruments as may be required to check the vessels speed and revolutions of the main engine.

Under the condition that the normal vessels operation not be effected, the Charterers and/or their supercargo(es) shall have free and unlimited access to the whole vessel, including bridge, holds and engine room and also to all vessel's tanks including but not limited to bunker, lubricating oil, sludge, ballast, and fresh water tanks.

Whenever required, the Master must bring the vessel into even trim to ensure correct bunker soundings as far as practically possible. The Charterers and/or their supercargo(es) and/or surveyors to have free and unlimited access to the vessel deck and engine log book, Tank plans, calibration scales and/or other plans as requested and are allowed to make copies of the original log books on board a shore.

**Clause 44 - Performance**
If the Charterers have the reason to be dissatisfied with the performance of the vessel, the Owners upon receiving substantiated complaints shall immediately investigate and take appropriate steps to correct the situation.

**Clause 45 - Stevedore Damages**
Stevedores to be appointed and paid by the Charterers but to work under the supervision of the Master. Should any damage be caused to the vessel or her fittings by the stevedores, the Master has to try to let stevedores repair such damage and try to settle the matter directly with them.
The Master to make highest degree of care to obtain written acknowledgement of the damage from the concerned stevedores. The Charterers shall not be responsible for any damage caused by stevedores to the vessel unless the Master notifies the Charterers or their agents of such damage within 24 hours from the occurrence, except in case of hidden damage, which to be notified to the Charterers as soon as practically possible after discovery, but not later than
redelivery.
Any stevedore damage affecting seaworthiness or trading ability at the port of occurrence at the Charterers' time and expense.
The Charterers shall have the liberty to redeliver the vessel without repairing the damages for which the Charterers are responsible, as long as the same do not affect the vessel's seaworthiness, but the Charterers undertake to reimburse costs of repair against the production of repair bills by repairers or dockyard unless otherwise agreed.

**Clause 46 - Off-Hire**
After suspension of hire, from any cause, the vessel shall be placed again at Charterers' disposal at the same port or place where hire was suspended.
Charterers may, however, in their operation accept the vessel on hire again in such position and at such time as the vessel may again in all respects be ready to comply with the orders and directions of the Charterers.

During any off-hire period to exceed 8 days the Owners to give the Charterers not less than 5 (five) days definite notice of resumption of the service.

If the vessel has been off- hire for a total period of 20 (twenty) consecutive days during this Charter Party, the Charterers are at liberty to cancel the balance of period of this Charter Party, and redelivery shall take place upon vessel being free of cargo.

## RIDER CLAUSES TO M/V "NIKAT" CHARTER PARTY DATED 26TH OCTOBER 2006

### Clause 47 - Punctual Payment
With reference to Clause 5 (five) it is agreed that the hire is to be considered correctly paid upon Charterers' bankers having paid irrevocably hire to Owners' bankers as stated in Clause 53.

Before existing the option of withdrawing the vessel from the Charterers, the Owners will give the Charterers 72 (seventy-two) hours (Saturdays, Sundays and holidays excluded) official notice in writing and will not withdraw the vessel if the hire is paid within the 72 (seventy-two) hours.

The Charterers have the liberty to retain sufficient funds from any hire to cover actual and estimated amounts including estimated off-hire for Owners' account.

### Clause 48 - Arbitration
All disputes arising out of this contract which cannot be amicably resolved shall be referred to arbitration in London. Unless the panics agreed upon sole arbitrator the reference shall be to 2 (two) arbitrators, one to be appointed by each parties. The arbitrators shall be commercial men, and the umpire, if appointed shall be a legal man, and shall be Members of the London Maritime arbitrators' Association otherwise qualified by experience to deal with commercial shipping disputes.

The contract is governed by English Law and there shall apply to arbitration proceedings under this clause the terms of the London Maritime Arbitrators' Association current at the time when the arbitration proceedings are commenced.

It is further agreed that the 7 (seven) days limit for appointment of the arbitrators, either originally or by substitution, shall be changed to 30 (thirty) days.

In the event the amount of claim and counterclaim has not exceed US$ 50,000.00, the parties agree to refer any dispute to a sole arbitrator in accordance with the "LMAA Small Claims Procedure 1989".

### Clause 49 - Speed
The Charterers may instruct the vessel to steam at any speed within the capabilities of vessel's main engine subject to Master's and Chief Engineer's approval, with reference to Lines 9 and 10 of this Charter Party, good weather condition is understood to mean all weather conditions not exceeding winds force Beaufort four and Douglas State 3.

### Clause 50 - Lieu of cleaning on Redelivery
With reference to line 54, the Charterers have the liberty to redeliver the vessel with unclean holds, against paying the Owners a lumpsum of US$ 4,750.00 lumpsum in lieu of cleaning excluding removal/disposal of dunnage and lashing material and/or other debris.

### Clause 51 – Intermediate hold cleaning – Deleted Not Applicable

### Clause 52 - Fittings
Charterers have the option to weld pad-eyes and other lashing / securing devices / points at their expense and subject to Master's approval which is not to be unreasonably withheld. Charterers to remove all such pad-eyes / and/or other lashing / securing devices / points prior to redelivery if required by Owners.

### Clause 53 - Description Clause
MV NIKAT
42.964 DWAT on 11,150 meters SW
Malta flag - Built 1983

**RIDER CLAUSES TO M/V "NIKAT" CHARTER PARTY DATED 26TH OCTOBER 2006**

LOA/BEAM: 192,54 meters / 30,00 meters
GRT/NRT:25107 / 14260
Grain/Bale 51,311.9 / 50,404.9 CBM
4 X 25 tons cranes – 4 grabs 10 CBM capacity each
5/5 Holds/Hatches - Hold dimensions (Length X Breadth ) on flag tanktop
    NO.1  25  X  FWD 12.4 AFT 22.4  X  13.7
    NO.2  26.2 X    22.6      X 13.7
    NO.3  26.2 X    22.6      X 13.7
    NO.4  26.2 X    22.6      X 13.7
    NO.5  25.2 X  FWD 22.6 AFT 12.0  X  13.7
Hatch Dimensions:
 - 16,8 M X 14.0 M X 2.25
 - 17,6 X 14 X 2.25
 - 17,6 X 14 X 2.25
 - 17,6 X 14 X 2.25
 - 17,6 X 14 X 2.25
Speed loaded/ballast: About 13 knots on 4 Beaufort consumption
   A) At sea: About 29 metric tons IFO 180 CST Laden/Ballast plus about 2,5 metric tons MDO
   B) In port idle/gear working per 24 hours: About 2,5 metric tons/ about 4,5 metric tons     DO
respectively
   Type of bunkers: IFO 180 CST to conform to RME 25 per ISO 8217  MDO to conform to DMB-
DB-M2 Standard
Constants : about 250 mt
Fresh water : about 120 mt
All details 'about' and without guarantee

**BANKING DETAILS**:
M&T Bank (Manufacturers & Traders Trust Company)
One M&T Plaza
Buffalo, NY 14203  USA

ABA No.   : 022000046
SWIFT ID  : MANTUS33
CHIPS UID  : 209791
Beneficiary : Schuyler Line Navigation Co.
Account No. : 983 802 3126

m.v. Nikat/Seafreight - vessel information :

Owners' name and full style
As per description Part 2: 5.
Nikat Maritime Limited
18/2 South Street - Valletta Vlt 11 - Malta
T: +356 21236206 / f: +356 21240321 / e: info@dingli.com.mt

Carriers' name and full style : n/a

Registered Owners' name and full style : n/a

Disponent Owners' name and full style :
Schuyler Line Navigation Co.
100 Severn Ave, Ste 103
Annapolis, MD 21403

**RIDER CLAUSES TO M/V "NIKAT" CHARTER PARTY DATED 26TH OCTOBER 2006**

If any, manager's name and full style
As per description Part 2: 6.
N.A.N.E. Shipping Management S.A
1 Psarron Street - Pallini 15351, Attica, Greece
t: +30 210 6664556 / f: +30 210 6667936 / e: oper@nane.gr

Master's name : Captain Oleksiy Borodavka

Kindly also advise vessel's contact numbers.
m.v. Nikat
t: +870 764146370
e: 421514120@internet-c.com
f: +870 764146371

**Clause 54 - Delivery of Cargo without Production of Bills of Lading**
If the original Bills of Lading should not be available at the port(s) of discharge at the time of
vessel's readiness to discharge, the Master and Owners shall allow Charterers/Receivers to
discharge the cargo against production of a single Letter of Indemnity in line with mate's receipts,
on Owners P and I wording signed by Charterers only. It is agreed that the signed Letter of
Indemnity may be presented to Owners by telefax. Original to be couriered as soon as possible.

**Clause 55 - NAABSA / Breaking I.W.L**
See main body of Charter Party

**Clause 56 - Vessel's Plans / DWT Scale**
Owners agree to fax to Charterers a copy of the vessel's deadweight scale latest on day of fixing in
full and mail one copy of vessel's general arrangement plan and capacity plan and mid ship section
plan within three days after fixing to Charterers as per Clause 29.

**Clause 57 - Deck Cargo**
Charterers have the option of loading cargo on deck and/or hatches always within the strength as
per description Clause at their own risk and expense. The relevant Bills of Lading to be claused
"Carried on deck at Shippers' / Cargo Owners' risk". In case vessel to load cargo on deck (excluding
cargo as per Clause 38) vessel to carry a full deck load and to load on hatches, in accordance with
normal hatches and such cargo on deck / hatches to be limited only by deck and hatch strength and
the vessel's stability and such cargo to be loaded to the Master's satisfaction.

**Clause 58 - Grabs / Grabs Suitability**
Charterers have the option of placing their own grabs onboard the vessel and attach same the
vessel's cranes / hooks. All necessary things to be arranged and paid for by the Charterers.
Charterers may store such grabs on board, on deck at their risk and expense and Charterers to make
their own arrangements with the Master / crew as to maintenance. Owners will on delivery instruct
the Master co-operate with the Charterers and/or their port captain in this respect. Vessel to provide
power for such electro-hydraulic grabs, 440 volt/ 60HZ, from vessel's generators.

Owners confirm that the vessel is suitable for discharge by grabs and that the Charterers have
liability to use bulldozers in the vessel's holds in accordance to vessel's tanktop strengths.

**Clause 59 - MGO usage  - Deleted**

## RIDER CLAUSES TO M/V "NIKAT" CHARTER PARTY DATED 26TH OCTOBER 2006
### Clause 60 - Freshwater and hold-cleaning -Deleted

### Clause 61 -  Steel Products / Surveys
In case steel products are loaded Charterers have the option to carry out a pre-shipment survey at their own costs. Owners are invited to join on a 50/50 basis.

### Clause 62
Bunkers on delivery to be about 1330/1380 metric tons IFO and about  50/115 metric tons MDO. Master estimates 1363.4 mt IFO and 91.6 mt MDO. Owners not to bunker vessel.  Charterers to pay for estimated consumption of bunkers on delivery (about 375 mt IFO and 115 mt MDO), together with first hire payment.   Charterers to redeliver with minimum 900 mt IFO and minimum 75 mt MDO.  Any difference to be settled on final hire, maximum 5 days after redelivery.
Bunker prices both ends USD 290.00 per metric ton IFO and USD 600 per metric ton MDO.

Value of bunkers estimated to be required to perform the voyage, which basis Nemrut Bay direct to Jebel Ali, estimated to be  about 375 mt IFO/115 mt MDO, to be paid together with first hire payment.

If caused by vessel's failure to provide her agreed technical capabilities under this Charter Party increasing the normal calculated voyage time and/or consumption and Charterers have stemmed bunkers for redeliver already,  Charterers are not responsible for exact replenishing  of bunkers on redelivery quantity as  above.

### Clause 63
A joint on/off-hire survey including bunker survey to be held at first loadport respectively at discharging port. Time and costs of such survey to be shared on a 50/50 basis between Owners and Charterers.

### Clause 64 - Drydocking Clause - Deleted

### Clause 65 - Double Banking Protective Clause
Charterers have the privilege to double bank the vessel only in such place within trading limits, where such facilities exist in customary lighterage areas and same is customary for similar size vessel for loading and/or discharging at Charterers' risk / expense / time, unless proved to be the fault of the Master. Charterers shall indemnify the Owners for any costs, damages and liabilities resulting from such operation. The vessel shall remain on hire for any time lost including periods for repairs as a result to such operation.

Master / crew to give every facility/cooperation in line with normal shipping practice. Master also has the right at any time to order vessel to sail, if he considers it is unsafe for vessel to remain double-banked.

Any additional fenders required for double banking be provided and paid for by Charterers.

### Clause 66 - Charterers' House-Flag -Deleted

### Clause 67 - War Cancellation
In the event of outbreak of war (whether it is a declaration of war or not) between any two or more of the following countries: U.S.A, United Kingdom, C.I.S., Russia, France, Australia, Germany, The People's Republic of China, Japan, Singapore or in the event that the country under whose flag the vessel sails becomes involved in a war, either the Owners or the Charterers may cancel the Charter.

**RIDER CLAUSES TO M/V "NIKAT" CHARTER PARTY DATED 26TH OCTOBER 2006**

**Clause 68 - Secrecy**
All negotiations and fixture to be kept private and confidential.
All terms, details and rates for this fixtures has to remain strictly private and confidential between all parties involved in this fixture. No details shall be divulged to any outside party at any time.

**Clause 69 - ISM Clause**
The requirements of the International Safety Management (ISM) code are hereby incorporated into the terms of this Charter Party. Owners warrant that on and after 1st April 1998, a Safety Management System (SMS) in accordance with the ISM code will be in operation both on shore and on board the vessel. Owners further warrant that on and after 1st July 1998 they (or "the company") as defined by the ISM Code shall have a valid safety management Certificate (SMC). Owners shall supply Charterers with copy of the DOC and SMC. Owners shall, when required by Charterers, provide a copy of the documents both ashore and on board the vessel    evidencing the SMS and its application, and when further required by Charterers, Owners shall provide a report of safety audits carried out internally or by the vessel's flag    administration.

Non-compliance with the requirements of the ISM Code shall be  deemed a breach of the Charter-Party.

**Clause 70 - BIMCO Standard Year 2000 Clause**
For Voyage and Time Charter Parties

Year 2000 conformity shall mean that neither performance nor functionality of computer systems, electronic and electro-mechanical fox similar equipment will be effected by dates prior to or during the year 2000. Without prejudice to their other rights, obligations and  defences under this contract including, where applicable, those of the Hague of Hague-Visby rules, Owners and Charterers -, and in particular the Owners respect of the vessel, shall exercise due diligence in ensuring year 2000 conformity in so far as this has a bearing on the performance of this contract.

**Clause 71**
In the event of the vessel deviating (which expression includes putting back, or putting into any port other than that to which she is bound under the instruction of Charterers) for any cause or for any purpose, the hire shall be suspended as from the commencement of such deviation until the time when the vessel is again ready and in efficient state to resume her service from a position not less favourable to Charterers than that at which the deviation commenced.

In the event of any delay to the vessel arising from one or more of the following reasons;
- deficiency of officers/crew or stores
- breakdown partial or otherwise, damage to hull, machinery, equipment
- detention by average incidents to ship/cargo including collisions/stranding
- repairs/drydocking or other necessary measures to maintain the efficiency of the vessel
- failure to be in possession of valid certificates or other documentation for the vessel/ officers/crew
- breakdown partial or otherwise, or non-conformity or disablement at one or any/all winches/cranes or any other part of vessel's equipment for loading/discharging cargo preventing full operation of vessel
- insufficient power to operate all winches/cranes at the same time if required
- cargo residues and/or rust scale and/or loose rust in holds.

The hired vessel to be off- hire any/all time thereby lost and Owners to pay all extra expenses incurred together with the cost of any fuel/gas/diesel oil consumed in consequence thereof,

**RIDER CLAUSES TO M/V "NIKAT" CHARTER PARTY DATED 26TH OCTOBER 2006**

including but not limited to stevedore standby time, if any, and which shall all be deducted from the hire.

It is understood that the vessel is fully off hire when she is not workable in full due to one of the above reasons, otherwise pro rata to the inefficiency.

**Clause 72**
No through Bills of Lading to be issued under this Charter Party.
Liner Bills of Lading to be allowed under this Charter Party. If Liner Bills of Lading used Charterers to remain responsible for all time/costs/expenses involved.

**Clause 73**
The Charterers to have the benefit of any return insurance premium received by Owners from their underwriters as and when received by reason of the vessel being in port for minimum 30 (thirty) days provided the vessel is on hire.

**Clause 74**
All vessel's holds on delivery to be clean and dried up so as to receive Charterers' intended cargo in all respects, free of salt, loose rust scales and previous cargo residues to pass hold inspection, hold survey to be carried out by an independent surveyor. In the event that vessel fails her inspection, if necessary Owners to wash and dry up holds to inspector's satisfaction.

Vessel to be put off-hire pro rata for the number of holds affected, should vessel fail hold inspection, provided vessel is permitted to commence partial loading in the holds that have passed survey, otherwise, vessel to be off-hire from time of failing till the time of passing re-inspection.

**Clause 75**
Owners guarantee that vessel's hatchcovers are watertight throughout this Charter and if any hatch cover found defective, same to be rectified at Owners' time and expenses to Charterers' satisfaction, Charterers also have the right to carry out hose test or in Charterers' option ultrasonic testing on all hatches at any time during this charter.

**Clause 76**
Owners to keep covered at their expense basic hull/war risk policy which includes war and strikes, war protection and indemnity, blocking and trapping (war loss of hire) and crew accident. Charterers to pay all extra war risk insurance premiums if vessel enters upon request of Charterers into areas excluded from the basic war risk coverage as defined by Lloyds of London.
However, before such insurance is placed by Owners, Charterers to be advised of premium quote by Owners insurers.
Owners/Owners war underwriters herewith irrevocably confirm that the rate quoted/billed is a net rate and not subject to volume-, no claim- or any other rebate.

In consideration of Charterers paying additional war risk premium for trading to additional premium areas only, Owners agreed that neither they nor their underwriters and insurers, shall make any claim of whatsoever nature against Charterers and/or Charterers' agents, underwriters or insurers, in respect of loss, damage or delay relating to or arising out of any war risk (as defined in amended Conwartime 1993). Where additional war risk premium is declared by vessel's underwriters, for the port(s)/area where the Charterers intend to deliver the cargo or part of the cargo on board as per Bills of Ladings issued, is in excess of what is acceptable to the Charterers, the Charterers shall have the option to order the vessel to proceed to different disport(s), always providing such port(s) is/are within the trading area permitted under this Charter Party.

**Clause 77 - Deleted**

## RIDER CLAUSES TO M/V "NIKAT" CHARTER PARTY DATED 26TH OCTOBER 2006

### Clause 78
If the Charterers have the reason to be dissatisfied with the performance of the vessel, the Owners on receiving particulars of the complaints shall immediately investigate and take appropriate steps to correct the situation.

### Clause 79
Owners confirm the vessel is a single deck, self-trimming bulk carrier fitted for the carriage of bulk grain in accordance with Solas 1974, and later amendment thereto, without requiring any bagging, strapping or securing when loaded with a full (deadweight) cargo of heavy grain of about sf 42 cf/mt in bulk provided there are no restrictions in loading/discharging ports or during sea passage with ends untrimmed and one, subject to stability, slack hold always left in seaworthy trim to masters satisfaction. should the vessel not be able to comply with same then all direct extra expenses, time, risk and consequences to be for Owners' account.

### Clause 80
The Master is to keep a record of all Charterers' gear, equipment, dunnage and/or stores supplied to the vessel and to maintain same in good condition. such gear, equipment, dunnage and/or stores to be returned to Charterers' prior to redelivery of the vessel to Owners or if requested by Charterers at any time during the period of the charter, in like good order and condition as supplied (fair wear and tear excepted) .

### Clause 81
Should the vessel be requisitioned by the government of the vessel's flag during the period of the charter, the vessel shall be deemed off-hire during the period of such requisition, and any hire paid by the said government in respect of such requisition period shall be retained by the Owners. However, the Charterers shall have the option to cancel the balance period of this charter.

### Clause 82
The vessel shall be delivered with valid deratting or deratting exemption certificate. If such certificate does not cover the whole period of this charter, costs of renewal of certificate and fumigation, if necessary, shall be for owners account. Any detention and extra expenses incurred thereby shall be also for the Owners' account.

### Clause 83
Normal quarantine time and expenses for the vessel entering a port shall be for the Charterers' account, but any time of detention and expenses for quarantine due to pestilence, illness and etc., of the master/officers and crew shall be for owners account, unless attributed to the cargo carried during the charter.

### Clause 84
The Owners guarantee that the vessel shall be fully fitted for Panama/Suez Canal transit and in possession of valid necessary certificates during the currency of this charter to comply with the current regulations and requirements of both canals.

### Clause 85
Should the vessel be boycotted, picketed, blacklisted, or similar incident including strike, lockout and labour stoppages at any port or place by shore and/or port labours and/or tugboats, and/or pilots, and/or by governments and/or by authority, by reason of the vessels flag/registry/manning or ownership or terms and conditions on which members of the master/officers/crew are employed, or by reason of trading of this vessel or other vessel under the same ownership, management, operation or control, or by reason of the vessels construction and/or her cargo gear and/or fittings and/or her other equipment, all consequences and any extra expenses incurred there from to be for

**RIDER CLAUSES TO M/V "NIKAT" CHARTER PARTY DATED 26TH OCTOBER 2006**

owners account and the Charterers are entitled to place the vessel off-hire for any time lost by such reasons.

**Clause 86**
Should the vessel be captured or seized or detained or arrested by any authority or by any legal process during the currency of this charter party, the payment of hire shall be suspended until the time of her release, unless such capture or seizure or detention or arrest is occasioned by any personal act or omission of default of the Charterers or their agents or cargo carried. Any extra expenses incurred by and/or during the above capture or seizure or detention or arrest for which Owners are responsible shall be for the Owners' account.

**Clause 87**
Charterers have the privilege of painting their own or Sub-Charterers' funnel mark and/or insignia on vessel's sides at their expenses and in their own time and shall repaint Owners' funnel mark and/or vessel's sides to Master's satisfaction on redelivery at Charterers' expenses and in Charterers' time. Time Charterers also have the option of flying their own or Sub-Charterers' house flag.

**Clause 88**
If one clause or part of a clause is void for any reason whatsoever this should not affect the entire contract but should be restricted to just that clause or the part thereof.

**Clause 89**
Whilst the Master/Owners are fully responsible for the number of bundles/coils stated in the Bills of Lading, they will not be held liable in respect of weight in the event only theoretical weights are entered into the Bills of Lading.

**Clause 90**
Charterers have the right to deduct commissions/brokerage and any agreed off-hire periods from hire payments.

Owners to cover their own, Master, crew, vessel's disbursement account directly with agents at each port of call. Owners to remain fully responsible for any delays and/or consequences arising from agents not being placed in funds timely. In the event Owners require Charterers to advance funds for their/ vessel's/ Master's/ crews disbursements then Owners to apply to Charterers in writing to obtain their prior approval. Charterers shall then have the right to deduct such amounts from hire payments however, Owners to remain responsible for the collection of vouchers from agents for such outlays.

          THE OWNERS                                THE CHARTERERS


**NEW BOTH-TO-BLAME COLLISION CLAUSE**

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:

**Both-to-Blame Clause**
If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the

**RIDER CLAUSES TO M/V "NIKAT" CHARTER PARTY DATED 26TH OCTOBER 2006**

navigation or in the management of the ship, Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other non-carrying ship or her Owners in so far as such loss or liability represents loss ox damage to or any claim whatsoever of the Owners of said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or Carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships, or objects are at fault in respect to a collision or contact.

And the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

**General Average and the New Jason Clause**

General Average shall be payable according to the York-Antwerp Rules 1994, and any subsequent amendments, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

**New Jason Clause**

In the event or accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statue, contact, or otherwise, the goods, shippers, consignees, or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred and shall pay salvage ship and special charges incurred in respect of the goods.

If saving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said saving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

**AMENDED BIMCO STANDARD WAR RISKS CLAUSE FOR TIME CHARTERS, 1993 Code Name: "CONWARTIME 1993"**

(1) For the purpose of this Clause, the words:

(a) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any

**RIDER CLAUSES TO M/V "NIKAT" CHARTER PARTY DATED 26TH OCTOBER 2006**

waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(3) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

(4) (a) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(b) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is
Due, subject to Owners submitting a copy of war unterwriters original policy wording, premium invoice and irrevocable payment vouchers.

**AMENDED BIMCO STANDARD WAR RISKS CLAUSE FOR TIME CHARTERS, 1993**
**Code Name: "CONWARTIME 1993" (continued)**

(5) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.
Additional crew war bonus to be for Charterers' account subject to Owners submitting a copy of the crew list, copies of original individual crew contracts revealing entitlement to and rate of such war bonus together with crew members signed war bonus receipts.

(6) The Vessel shall have liberty:-

(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(b) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

## RIDER CLAUSES TO M/V "NIKAT" CHARTER PARTY DATED 26TH OCTOBER 2006

(d) to divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(e) to divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and
requesting them to nominate a safe port for such discharge.  Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(8) If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charterparty.


## BIMCO Standard Law & Arbitration Clause 1998 - English Law, London Arbitration

This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-
enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators.  A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that  notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified.  If the other party does not appoint its own arbitrator and give notice that it has done  so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly.  The award of a sole arbitrator  shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings
are commenced.

## U.S.A, Clause Paramount
This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of  any of its responsibilities or liabilities under said Act. The provision

**RIDER CLAUSES TO M/V "NIKAT" CHARTER PARTY DATED 26TH OCTOBER 2006**

stated in said act shall (except as may be otherwise specifically provided herein) govern before the goods are loaded on any after they are discharged from the ship and throughout the entire time the goods are in the custody of the carrier. The carrier shall not be liable in any capacity whatsoever for any delay, non-delivery or mis-delivery or loss of or damage to the goods occurring while the goods are not in the actual custody of the Carrier.

**BIMCO ISPS Clause for Time Charter Parties**

**a) (i)** From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and the Company. Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

 **(ii)** Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or the Company to comply with the requirements of the ISPS Code or this Clause shall be for the Owners account.

**b) (i)** The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners.

 **(ii)** Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers account.

**c)**   Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers account, unless such costs or expenses result solely from the Owners negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners account.

**d)** If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

# Ex. B

15-DEC-2006 14:55 FROM:JAMES GREE. .Y    00442032890810    TO:01708640. .    P.2/3

# I N V O I C E

## MV NIKAT

15th December, 2006

| | |
|---|---|
| Hoisting wires as per attached offer<br>Euros 4,850 each X 3 pcs | Euros 14,550 or<br>USD 19,292 |
| Sheeves & ball bearings for cargo blocks<br>as per attached offer X 2 pcs | Euros 8,360,70 or<br>USD 11,085 |
| Crew overtime for repairing the cargo blocks<br>And replacing the hoisting wires as per attached<br>calculations | USD 1,476 |

T O T A L    USD 31,853

# Ex. C



## SCHUYLER LINE NAVIGATION COMPANY

| MV Nikat |
|---|
| CHARTER PARTY DATED 26 October 2006 |
| Preliminary Final Hire Statement |

| | | | | | Charterer's Credit | Owner's Credit |
|---|---|---|---|---|---|---|
| **CHARTER HIRE** | GMT | | | GMT | | |
| | 11/5/2006 10:30 | to | | 12/15/2006 1:10 | | |
| | Daily Hire : | | $24,000.00 | 39.6111 days | | $950,666.67 |
| **BALLAST BONUS** | | | | | | |
| | none | | | | | |
| **OFFHIRE** | | | | | | |
| | none | | | 0.0000 days | $0.00 | |
| **COMMISSIONS** | | | | | | |
| | 5% Commission | on Charter Hire | | | $47,533.33 | |
| **BUNKERS** | | IFO | MDO | | | |
| | Delivery | 1372.300 | 96.593 | | | |
| | Redelivery | 1109.700 | 75.300 | | | |
| | + Owners Supplied Bunkers | 0.000 | 0.000 | | | |
| | Less Offhire | 0.000 | 1.927 | * see below | | |
| | Difference | 262.600 | 19.366 | | | |
| | Cost | $290.00 | $600.00 | | | |
| | Total | $76,154.00 | $11,619.60 | | | $87,773.60 |
| **CHARTERER'S ITEMS** | | | | | | |
| | C/E/V for Voyage | $1,250/mo. | | | | $1,650.46 |
| | ILOHC | | | | | $4,750.00 |
| **MISCELLANEOUS** | | | | | | |
| | Crane Runner + Block Repairs and Parts | (see attached) | | | | $31,853.00 |
| **LESS HIRE PAID TO OWNERS** | | | | | | |
| | First Hire Payment | | 6-Nov-06 | | $493,683.60 | |
| | Second Hire Payment | | 22-Nov-06 | | $281,096.40 | |
| | Third Hire Payment | | 6-Dec-06 | | $32,577.23 | |
| | Fourth Hire Payment | | 11-Dec-06 | | $53,972.50 | |
| | Fifth Hire Payment | | 13-Dec-06 | | $42,476.86 | |
| | Sixth Hire Payment | | 21-Dec-06 | | $69,036.66 | |
| | | | **BALANCES:** | | **$1,020,376.58** | **$1,076,693.73** |
| | | | Balance Due: | | $0.00 | $56,317.15 |

E,E&O

---

**Bunker Off hire calcs:**

1) Hold Cleaning before Delivery
| | | | |
|---|---|---|---|
| DOP Nemrut Bay | 11/4/2006 19:00 | | |
| Delivery to Seafreight | 11/5/2006 12:30 | | |
| | 17:30:00 | @ 2.5 MT/day | = 1.927 MT MDO |

**Ex. D**

Manufacturers and Traders Trust Company

FOR INQUIRIES CALL:

| ACCOUNT TYPE |
| CORPORATE CHECKING |

| ACCOUNT NUMBER | STATEMENT PERIOD |
| | 11/01/06 - 11/30/06 |

SCHUYLER LINE NAVIGATION CO
100 SEVERN AVE SUITE 103
ANNAPOLIS MD 21403

BEGINNING BALANCE
DEPOSITS & CREDITS
LESS CHECKS & DEBITS
LESS SERVICE CHARGES
ENDING BALANCE

## ACCOUNT ACTIVITY

| DATE | TRANSACTION DESCRIPTION | DEPOSITS & CREDITS | CHECKS & DEBITS | BALANCE |
|------|------------------------|---------------------|------------------|---------|
| 11/07 | INCOMING CHIPS FUNDS TRANSFER FOREVER MARITIME LTD | 493,663.60 | | |

PAGE 1 OF 6

LD1B (2/63)



**M&T Bank**

Manufacturers and Traders Trust Company

FOR INQUIRIES CALL:

| ACCOUNT TYPE |
|---|
| CORPORATE CHECKING |

| ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|
| | 11/01/06 - 11/30/06 |

SCHUYLER LINE NAVIGATION CO

## ACCOUNT ACTIVITY

| DATE | TRANSACTION DESCRIPTION | DEPOSITS & CREDITS | CHECKS & DEBITS | BALANCE |
|---|---|---|---|---|
| 11/21 | INCOMING CHIPS FUNDS TRANSFER FOREVER MARITIME LTD | 281,096.40 | | |

MANUFACTURERS AND TRADERS TRUST COMPANY

Manufacturers and Traders Trust Company

FOR INQUIRIES CALL:

| | ACCOUNT TYPE |
|---|---|
| | CORPORATE CHECKING |

| ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|
| | 12/01/06 - 12/31/06 |

SCHUYLER LINE NAVIGATION CO
100 SEVERN AVE SUITE 103
ANNAPOLIS MD 21403

| BEGINNING BALANCE | |
|---|---|
| DEPOSITS & CREDITS | |
| LESS CHECKS & DEBITS | |
| LESS SERVICE CHARGES | |
| ENDING BALANCE | |

## ACCOUNT ACTIVITY

| DATE | TRANSACTION DESCRIPTION | DEPOSITS & CREDITS | CHECKS & DEBITS | BALANCE |
|---|---|---|---|---|
| 12/06 | INCOMING CHIPS FUNDS TRANSFER FOREVER MARITIME LTD | 32,577.23 | | |

MANUFACTURERS AND TRADERS TRUST COMPANY
25 S CHARLES ST BALTIMORE MD 21201



**M&T Bank**
Manufacturers and Traders Trust Company

FOR INQUIRIES CALL:

| ACCOUNT TYPE |
| --- |
| CORPORATE CHECKING |

| ACCOUNT NUMBER | STATEMENT PERIOD |
| --- | --- |
| | 12/01/06 - 12/31/06 |

SCHUYLER LINE NAVIGATION CO

## ACCOUNT ACTIVITY

| DATE | TRANSACTION DESCRIPTION | DEPOSITS & CREDITS | CHECKS & DEBITS | BALANCE |
| --- | --- | --- | --- | --- |
| 12/11 | INCOMING CHIPS FUNDS TRANSFER<br>FOREVER MARITIME LTD | 53,972.50 | | |
| 12/13 | INCOMING CHIPS FUNDS TRANSFER<br>FOREVER MARITIME LTD | 42,476.86 | | |

PAGE 2 OF 6



**M&T Bank**
Manufacturers and Traders Trust Company

FOR INQUIRIES CALL:

| ACCOUNT TYPE |
| --- |
| CORPORATE CHECKING |

| ACCOUNT NUMBER | STATEMENT PERIOD |
| --- | --- |
|  | 12/01/06 - 12/31/06 |

SCHUYLER LINE NAVIGATION CO

## ACCOUNT ACTIVITY

| DATE | TRANSACTION DESCRIPTION | DEPOSITS & CREDITS | CHECKS & DEBITS | BALANCE |
| --- | --- | --- | --- | --- |
| 12/21 | INCOMING CHIPS FUNDS TRANSFER FOREVER MARITIME LTD | 69,036.66 | | |

MANUFACTURERS AND TRADERS TRUST COMPANY